Hear ye, hear ye, this Honorable Appellate Court for the 2nd District is now open. The Honorable Justice George Bridges presiding, along with Justice Catherine E. Zinoff and Justice Mary S. Shostak. The case is number 2180696, People of the State of Illinois, Plaintiff-Appellee versus Michael Culpin, Defendant-Appellant. Arguing for the Appellant, Christopher McCoy. Arguing for the Appellee, Adam Trejo. Good morning. Are both parties ready to proceed? Yes. Yes. I don't know. Okay. Thank you. Then, Mr. McCoy, you may proceed. May it please the court, counsel. My name is Christopher McCoy from the Office of the State Appellate Defender and I represent Mr. Michael Culpin. Your Honors, we raised two arguments in this case. First, that the trial court erred in denying the motion to suppress. And second, that Michael's de facto life sentence was both unconstitutional and excessive. On the first issue, the trial court denied the suppression motion based on the emergency exception to the Fourth Amendment. This exception applies only if there's a need for immediate action for the purpose of providing aid to persons or property. And in this case, there just simply wasn't this need for emergency action. And that's shown by the police officer's own actions in this case. First, there is the sheer amount of time. Officers waited approximately one hour from when they arrived at the apartment building the second time before entering the individual unit. Now, other cases have found that the emergency exception does not apply when officers wait for a much shorter time, anywhere from 10 to 30 minutes has been deemed too long because it undercuts the idea that there is an ongoing emergency. And besides just the time, the officers simply didn't act like this case was an emergency. When they arrive at the apartment, they look in the windows, they talk to the neighbor across the hall, then they knock on Michael's door and wait five to 10 minutes for him to open the door, take everyone out in the hall to talk to them. And at one point, Michael says he's going to get sick. So they take him outside. And then officers call the station to start working on a warrant. They find out it will take at least two hours to get that warrant. Then they huddle up. And it's at that time they decide, well, now there's an emergency. Now we need to enter the apartment. Simply put, this isn't typical behavior from police officers in an emergency situation. They were not acting as if they thought anyone was in mortal danger. Officers didn't call an ambulance. There's no evidence they brought in medical supplies when they entered the apartment. So really, the officer's behavior itself is the best indication that the emergency exception simply did not apply in this case. Turning to the second issue, Michael's 63-year de facto life sentence was unconstitutional under both the Eighth Amendment and the Proportionate Penalties Clause. Now, obviously, Michael was not a juvenile. He was 20 years old at the time of the offense. But it's important to note that we're not asking this court to make a ruling about every defendant between 18 and 21 years old. Instead, we're making an as-applied challenge for this individual defendant. So turning to the facts about Michael himself, it really starts with his horrific childhood. He's born a drug addict. At a very young age, his mother commits suicide. And then his father remarries. And Michael's not even allowed to talk about his birth mother anymore. He's not allowed to process this very traumatic event in his early life. And then Michael sees his father abuse his stepmother. Michael himself is very seriously abused. He later is diagnosed with bipolar disorder, develops substance abuse problems, makes multiple suicide attempts. And all the while, his father is minimizing these problems. Michael's father is sort of treating it as fraudulent, as a sign of weakness. And ultimately, this terrible upbringing, it does more than just make Michael a sympathetic figure. It also affected his brain development. Scientific research tells us that abuse slows down brain development, especially in the area of self-control. It makes the victim of abuse hypervigilant and prone to overreact to minor events. And then we look at the psychological evaluation in this case, and it says the same thing. It says Michael is suspicious and hypervigilant. He's easily triggered by even mild stressors and perceives them as major events and ruminates on them for an extended period of time. And then we look at the facts of this case. And that's exactly what happened. Michael was jealous, apparently, that his girlfriend was talking to guys on Facebook. And he was mad that she was staying out so late at night. And then he overreacts and events spiral out of control to the point where we get the tragic result that we have in this case. Also affecting his brain development, Michael used drugs to self-medicate his mental health issues. And substance abuse decreases one's capacity to evaluate and control behavior. It makes people act impulsively. It makes them ignore future consequences. And all of this reinforces the underlying tenets of Miller, which is that young people's, I mean, Miller is based on the fact that young people's brains are not fully developed. But what Miller also tells us is that it's only the rare juvenile that's irretrievably deprived, most mature out of law breaking as this neurological development continues. And we see that in Michael's case. He's in jail for approximately two years from the time of the offense to sentencing. And in that time, he has zero incidents in jail. His family, multiple family members notice a change in his attitude. He's off of drugs. And then at sentencing, he makes a very eloquent, very remorseful statement in allocution. And this, again, ties back to the psychological evaluation, which says that Michael has the capacity to change. So in many ways, he really exemplifies some of the underlying reasoning of Miller. Now, apart from these individual facts about Michael, there's also some general societal recognition that supports treating those under 21 differently than older adults. Scientific research shows that brain development continues past 18. It continues into the mid-20s. And again, as I said before, brain development really is the heart of the Miller rationale. And as a society, we know this. That's why we have traditional demarcations at the age of 21. If you're under 21, you're not allowed to buy alcohol, to possess a gun without parental permission, not eligible for mandatory class X sentencing. And recently, the legislature has amended the parole laws so that defendants who are under 21 at the time of offense are now eligible for parole after serving 20 years. So clearly, the legislature sees defendants under 21 differently than older adult offenders. Unfortunately, Michael didn't qualify for that law based on when he was sentenced. If he'd been sentenced 11 months later, he'd actually be eligible for MSR over 40 years earlier than he currently is. But besides the legislature, Illinois courts, too, have applied the Miller reasoning to defendants between 18 and 21. And notably, in the recent case of People v. Rivera, the state itself argued that youthful offenders are those who are under 21. Now, while this court has never made that explicit holding, in Suggs, this court did support for extending treatment of young offenders past 18. In Suggs, the defendant was 23, so it really didn't apply. But still, this court recognized some of the things that we're talking about in this case. So all of this is to say, we're not asking this court to break new ground. We're not asking this court to go out on a limb. We're asking to recognize what's already been recognized by the legislature, by research, and by other courts in the state. And finally, in making these arguments, we're not denying that this was a serious and tragic case. But that being said, the de facto life sentence here was still unconstitutional as applied to Michael. And even if not unconstitutional, it was at least excessive for these reasons and all the reasons that we laid out in our brief. So in conclusion, Michael, respectfully ask this court to reverse the order denying the motion to suppress or alternatively to reduce the sentence or remand the case for a new sentencing hearing. Thank you. Thank you, counsel. Justice Inhofe, do you have any questions? Yes, I do. Good morning, counsel. Good morning. The police initially responded to a missing person's report, correct? Yes. It was the victim's mother who said she hadn't been in contact with her since the previous Friday. That's correct. Isn't that correct? Yes. While this was not a 911 call of an emergency in progress, all of the cases you cite in support of your argument involved emergency calls. Lomax involved a 911 call of gunshots. Keister or Kester involved a 911 hang up call. Konecki, a woman who was in a hysterical state. Meadows, 911 report of dynamite. I mean, how are any of these cases applicable to a missing person's report? Well, that is true, Your Honor. I mean, all the facts are slightly different. And when we evaluate the emergency exception, it is evaluated on the totality of the circumstances. But the things that come through those cases, even though the facts are different, is that this need for immediate action and the fact that officers waiting a certain amount of time undercuts that notion that there is an ongoing emergency. And so that is what we are relying on those cases for. Well, counsel, did you do a national search for missing persons cases? No, Your Honor. We relied exclusively on Illinois cases. OK, well, there are two cases, several cases we found, one of which was People v. Rogers, the Supreme Court of California case from 2009 involving the application of this doctrine in a missing person's situation, as well as the Supreme Court of Iowa case. The California case is 46, California, 4th, 1136. And State of Iowa v. Carlson, 548, Northwest, 2nd, 138. And the gist of those cases involved a missing person's report, but also talked about the circumstances under which this test should be applied. In this situation, wasn't the purpose of the initial response to do a well-being check? That is, the police were advised at 840 that the mother couldn't contact her daughter since Friday. Her car wasn't in the lot. So the police had to do more investigation. Did they not at that point? They did. Obviously, it was investigating a well-being check. However, I'll go back to the point I made earlier. Once they get there, they're not acting as if there's an immediate need for action. They're not acting as if there's a reason to needed to assist the person or property in need of immediate assistance. Counsel, is there a bright line that says exactly how much time has to pass before the reasonableness of an officer's belief that emergency exists is determined by the entirety of the circumstances? It's determined at the time of the entry, correct? Well, there's no bright line time. No, I agree with that. And it is a totality of the circumstances test. But the cases we've cited look at the time element as evidence that, again, undercuts this notion that there is an immediate need, that there is this taking care of. And here, it's much longer than those cases. Those cases, again, were 10 to 30 minutes held to be too short of a time. I mean, here we're dealing with over an hour. And again, besides just the time, what the officers are doing in that time, while they are investigating, they're certainly not acting as if that there's any need for immediate action. Well, but at the time they entered, they knew that Maria had not been at work in two days, that the defendant had lied about taking her to work that Saturday, about going into work, that he had lied to Susan about it, that her car at that second time was in the parking lot, the neighbor hadn't seen her, that the defendant had gathered the information by then, the defendant had a history of violence against her. Then the defendant became high, or said he was high and sick on drugs. And then he said he didn't know how many people were in the apartment. It's a progression of the facts that lead up to their decision at that point to enter the apartment. And it's at that point that the reasonable test is applied. Isn't that what Farrell tells us, the Illinois case, People v. Farrell? Yes, but again, it is a totality of the circumstances test. And part of the totality of the circumstances is how the officers are acting and how much time it took them to take action. I mean, just to highlight a few of the factors that you mentioned, the officers perhaps have reason to be suspicious based on some of Michael's answers. But suspicion alone isn't the same as a need for an immediate action. And that is what is lacking. Well, but they thought by the time they went in, that there was an emergency involving the drug overdose. I mean, anyway, I do hear your points that you've made, counsel, with respect to this. And I do have several other questions on a couple of the other aspects of your argument. With respect to Miller, you have acknowledged this court's decision in LaPointe, in fact, Justice Shostak was the author, that's the 2018 Second District case, in which we flatly held that Miller does not apply to a sentence imposed on someone who was at least 18 when the offense was committed. So until our Supreme Court tells us we're wrong, why should we not apply LaPointe to this case? Well, other courts, I think it's, first of all, I think it's important to recognize we are doing an as-applied challenge. And obviously, every as-applied challenge is going to be a little different based on the facts of dealing with a different defendant. So I think to that extent, it's distinguishable. To the extent that it's not distinguishable, we're asking this court to reconsider that decision in light of new developments, in light of specifically the legislature amending the parole laws and some recent case law that has come out indicating that an as-applied challenge, especially on the proportionate penalties clause, is permissible for a defendant between 18 and under 21. Well, regarding the as-applied challenge, I mean, none of the new scientific studies that you rely on on your brief was argued to the trial court, were they? No, but... And so the trial court did not have an opportunity to make any findings with respect to how that research applies to this defendant, did it? Well, a lot of the scientific research and a lot of the underlying elements of Miller are really echoed in the psychological evaluation that is included in the record and was presented at sentencing. And I think, you know, this is a very unusual case. It's most cases where we just have the PSI. That would be a valid point. But here we have so much more. There's hundreds of pages of medical records. There's a psychological evaluation. And there's these very detailed letters from family members that really paint a vivid picture of what Michael underwent as a child. So because of all of this, and because it directly ties to that scientific research and to the reasoning of Miller, that there is enough here to present an as-applied challenge. And lastly, I would just mention that, you know, the state has not disputed any of our scientific research, and much of which has been cited by other courts in the state. Moving on for just a minute, I have one more question. When it was clear, became clear from the evidence that the defendant brutally murdered Maria and then entertained friends in his living room with her body in the bedroom, did the court really have to make a specific finding that the defendant's conduct showed irretrievable depravity? Doesn't the act speak for itself? Well, in considering what the defendant did after the murder, I mean, this is, I think it actually cuts both ways because, like, they're not pleasant facts. But he, you know, this isn't a brilliant master plan to conceal a homicide. He's not thinking about the future. He's thinking about the moment. He's thinking about, you know, getting drugs and hanging out with his friends. And this, I mean, this is what an adolescent would be thinking about, not the future consequences and not, you know, what happened, but just thinking about the moment in front of him. So I believe that that actually, in certain ways, supports the notion that Mr. Copeland was more akin to an adolescent than to an older adult offender. And all of that done by him in the presence of their infant son, I might add. Those are the questions that I have at this time. Thank you, counsel, for answering them. Thank you, Justice Zinoff. Justice Shostak, do you have any questions? I have just a few because Justice Zinoff did a very detailed questioning at this point based upon most of my questions were going to be based upon the entirety of the circumstances. And I think she's covered that well. I do have a couple of questions, Mr. McCoy. When the police were searching at the home, they were searching for her, were they not? And not for a dead body. I mean, they go in to see what else is in the apartment. They're not, you know, it doesn't appear that they're trying to investigate a crime. So that is correct. Did they not tell him they were going to search for a place where a body could be or that they were looking for her based upon this missing persons report? Well, I apologize. How do you come to the conclusion that they were looking for other things in the apartment as opposed to her? I apologize. I don't believe I articulated that well. Yes, I'm agreeing with the premise of your question. We're not challenging the factor that they are. They're looking for her. They're looking, you know, to see what to make sure no one else is in the apartment. Yeah, we're not challenging that. Okay. Also, one other question with respect to the as-applied challenge. I think, again, Justice Zinoff covered that correctly and covered the LaPointe case extensively. So I won't ask any more on that. But was this defendant not eligible for an extended term sentence? He was. The sentencing range in this case was 20 to 100 years. 20 to 100, and he got 60 plus the three consecutive, correct? Correct. And the irretrievable depravity did not need to be proved in or need to be set out in this case because he was not 18 or under, correct? Well, our argument is that it does need to be. That based on, you know, the circumstances of his life and the amount of evidence shown in the record that constitutionally, it did need to be found before he could be sentenced to a de facto life sentence. Right. I know, and I get that. And you've made a very passionate argument in this case based upon his mental health issues, his bipolar, his drug use. But that's not what Miller tells us, and that's not what LaPointe tells us, correct? No, that's not the particular holdings of those cases. However, I mean, other cases have, you know, particularly the House case and some of the other cases we cite in our reply brief that even those, you know, over 18, the particular circumstances, their particular brain development may make them more akin to adolescents than older adults, which is the argument we're making here. Right. In the Gibson case that you cite and you're relying on basically for the mental health issues, et cetera, the facts in the Gibson case were a little different than the facts here. I mean, you didn't even have somebody die in that case. Not that those injuries weren't extensive, but those were a little different than the case that we have here where we have Maria who was murdered and then he tried to conceal the crime. He's had 10 prior incidents, many of those incidents, domestic batteries against her. So can't we distinguish that Gibson case? And if not, why not? Obviously, Gibson, as in every case, is going to have factual distinctions. I would point out that there have been other cases with murders in which, you know, and just to answer some of the other things you mentioned in your question, first, regarding the 10 prior incidents of domestic abuse, though, yes, those occurred, but really they can't be separated from his childhood. I mean, he saw abuse. He was abused as a young child. And as the psychological evaluation tells us, he mimics that. That's, you know, what he learns and what he, it actually says in the psychological evaluation that his chaotic childhood further contributed to his maladaptive manner of coping and his behavior mirrors many of his early experiences. So I think it's difficult to separate that out. And again, I'll just say with his actions after the murder, I mean, this isn't a master plan on how to conceal a homicide. What is his endgame? Does he think he's going to keep this body in a closet forever? I mean, again, these are the actions. Sounds to me like that was his endgame. But that's not a realistic possibility. How about the telephone conversation he had with his sister while he was in jail? I mean, I get everything you're saying. I mean, this is a horrible, very sad case. He had a horrible, horrible upbringing. But at what point do we punish? And at what point do we try to rehabilitate? You know, we have to look at, and as the trial court did, we have to look at all of these factors, correct? Absolutely. But what Miller and its perogeny tell us is that, what is about rehabilitation for when people do not have fully developed brains and fully and the consequences of that. So when do we have to punish? When does he have to take responsibility? Well, at this point, and even as the legislature recognized in its recent amendment to the parole laws, under 21, it's different than older adult offenders. So at this point, and given all of the facts regarding Michael, you know, rehabilitation is just so much more important than it would be for an older adult offender. Thank you very much, Mr. McCoy. Appreciate your time. I'm through, Justice Bridges. Thank you, Justice Shuster. Mr. McCoy, you cite in your brief that the emergency exception requirement, requires an immediate response to comply with the Lomax holding. Isn't this a situation that is before us that is very fluid? You have the police who returns to the victim's house and sees the victim's vehicle has returned. They speak with the defendant. Notice he has experienced a possible overdosing event. He doesn't know if anyone else is in the apartment. Then they enter. Why isn't this an immediate response by the officers? Well, obviously, you know, the officers are talking to people and investigating the crime, but they're never acting with this immediate need that something is happening. I mean, Michael is clear that Maria is not in the apartment. Everyone that the officers talk to say that she is not in the apartment. And so the fact is that, again, just looking at how they're acting and how they're treating the situation, it refutes the need for that there was a need for immediate action because the police officers are not ever taking immediate action in this case. Even when they have spoken to everyone, they still take the time to talk together, call the station about a warrant and then decide to go in. So it is fluid, but it's still there's no immediate need ever in this case. Counsel, but they hadn't been gone that long. And when they get back, the car is back. He lies about taking her to work. Well, let me let me just go to this one here. What other reason would make him unsure if anyone else was in the apartment? He can see his two friends that are outside with him being talked to by other officers. What what other reason would there be other than to suggest that the victim was in the apartment? Well, again, he follows up that answer by repeatedly saying that she's not in the apartment. And I understand that. I apologize for, you know, cutting you off. I understand that part. But what I'm saying is, is that what what would make him unsure someone else was in the apartment? I don't know of anything off the top of my head, but that still doesn't show an emergency in that. I mean, there's reasons to be suspicious of Michael. We're not denying that. But again, suspicion alone doesn't rise to this is an emergency situation. OK, and Mr. McCoy, when the defendant told the officers he had marijuana and a legal crack pipe in the apartment, didn't that give the officers probable cause to arrest him then and search the apartment? Well, at that point, he's he's out of the apartment. So the I mean, they would need a warrant to go and to search the apartment. OK, thank you. The other questions I had were asked by other justices. So thank you, Justice Zinoff. Do you have any additional questions? No, I do not. Thank you, Justice Shostak. Do you have any additional questions? No, thank you. Thank you. Thank you, Mr. McCoy. At the end of the Appalese argument, you will have an opportunity for rebuttal. At this time, Mr. Trejo, you may begin your argument. May it please the court, counsel, Adam Trejo, on behalf of the people of the state of Illinois. As this court pointed out that the cases relied on by the defendant in regards to the first 911 callers, but also wanted to know that in those cases when the police arrived, they spoke to the 911 caller and the caller told the police everything's fine. They dispelled any reasons why an emergency would happen by that caller. Here, Susan is clearly adamant that her daughter has been missing for two days. Please go and look for her. They have a relationship with the defendant where he's physically abused her. I am concerned. Also, in those other cases headed by the defendant, the police had already conducted searches in a lot of them, like two searches, before coming back and trying to find more contraband, such as in borders where they tried to find a gun after already conducting searches. So here, clearly, this is a brand new case with these officers. This is an emergency phone call. The crux of defendant's argument, basically, is that the officers needed to immediately act like an emergency happened once they got that initial 911 call. But that is not the law. And if that were the case, officers would need to act like an emergency happens the moment a 911 call or a missing report is submitted to the police. But the law clearly states that the officers must have a reasonable basis for determining whether an emergency exists at the time of entry. The validity of the emergency aid exception is not contingent on the length of the investigation or the time needed for the officers to gather information to reasonably conclude that an emergency exists. As this court noted, this is a fluid situation. The officers are acting on the information that they're acquiring as they go. In the initial phone call, Susan, the only information the officer is given is that, my daughter has been missing for two days, and the police were given her vehicle information. They arrive at the apartment. The vehicle is not there. No one is answering. It doesn't appear that anyone is there. So the officer goes back and the mother calls again with more information, providing more context. And all this is building up. Susan tells the officer, she hasn't been to work that day. The supervisor has called me. Defendant has physically abused Maria. All these other facts. So the officers go back to conduct a wellness check in response to this missing persons report. They go and they knock on the door and the defendant points out that they wait a couple of minutes. Well, they're waiting a couple of minutes because the defendant is moving the body into a closet. That's why the officers are waiting there, minutes, because the defendant is trying to conceal the body before opening the door. Defendant opens the door and they see another man standing behind the defendant. Two officers escort him on the south end of that building, and they begin questioning him. And then another officer, Officer Teehan, stays behind with a couple that were in the apartment with the defendant. The defendant makes incriminating statements. And these aren't statements that are ambiguous. He's stating, you know what? I just did marijuana. I just did crack. There's something in the closet that could put me in jail for a long time. He's stating that Maria has gone into work. Now, the officers explicitly tell the defendant, we're here to check on Maria. We're here to conduct a wellness check. Is she in there? And the defendant states no. The officers tell them, we know you're lying. We've been told that she did not show up to work. Defendant states that they took an Uber together that morning, but that doesn't explain why Maria's vehicle is in the parking lot of the apartment. Defendant states that he doesn't know who else is in the apartment besides his two friends. He looks like he's going to heave. He looks like he's on drugs. His eyes are rolling back. And at that point, another officer is so concerned and has probable cause to believe that there's drugs in the apartment that he calls a superior and states, we're here to conduct a wellness check, but I'd like to get the ball rolling on a narcotic search warrant because it looks like it's a drug investigation. And I'm pointing this out because even if the emergency aid doctrine doesn't apply, the inevitable discovery doctrine applies 100%. This is a textbook case of the inevitable discovery doctrine. He initiates a search warrant to search for drugs, and that sets the ball rolling for the independent investigation. But nevertheless, they state the main purpose here is to check on this victim, to check on this person who's been missing for two days. They go in after they confer, the three officers confer, and they talk about it. And the defendant makes a point to state that, well, they're not acting crazy. They're not acting like it's an emergency. These are trained professionals. They're trained professionals to act calm under pressure. If they're acting, if they're yelling, if they're acting in a panic, that defers the purpose of conducting an investigation. These are trained professionals who can act in a calm, reasonable manner when responding to calls, to emergency calls, to missing person reports. They go in, and they're not looking for drugs. The trial court found this. They're not trying to look for cocaine, paraphernalia. They're in there trying to locate this missing daughter, this missing teenager who has a child who has not been seen for two months by her own mother. They go, and they see that the bedroom door is closed because the defendant closed it. They opened it to check to see if Maria is there. She's not. But guess what? The closet door is also closed because the defendant closed it to hide the body. They open that door, and guess what they find? They find a 19-year-old wrapped inside a curtain and wrapped in another blanket. Immediately upon this discovery, they leave. And the trial court made this note. They're not in there to search for drugs. They were in there to find her. And once, unfortunately, they found her dead, they left. So it's clear that their purpose is to check on the well-being of this individual. Moving on to the second issue. As this court has noted, LaPointe states that Miller doesn't apply to 18-year-olds. That we know. And to the point that defendant cites people be thugs, well, in that case, this court noted that Miller has never been applied to an individual over the age of 21. That just hasn't happened. The state acknowledges that other districts have applied Miller to 18 and 19-year-olds, which is confusing because there's contradicting case law on that. But here, the defendant is 20 and a half years old. He's six months away from turning 21. And to the point that other courts have applied Miller to other young adults, there are factors that courts look at when deciding, does Miller apply to the young adults? And that's where I point to People v. White, a case that I think is instructive of the issue. In People v. White, we have a 20-year-old defendant, same age as this defendant, who's convicted of the same offenses, first-degree murder and concealment of a homicidal death. And in People v. White, the defendant makes the same arguments this defendant makes in this case, arguing that his mandatory natural life sentence for first-degree murder and concealment of a homicidal death violated the Eighth Amendment and the Illinois Constitution. And in that case, in People v. White, the court said, the fact that the defendant was 20 years old when he brutally murdered two people and attempted to conceal his involvement was not reason enough to consider him youthful, such that his life sentence, which was mandatory in that case, violates the Eighth Amendment. So courts look at, in applying Miller to younger adults, they look at the culpability in planning. They look at the culpability in committing the offense, in attempting to avoid detection, in the criminal history of the defendant. And yes, the state acknowledges House, and other courts have distinguished House, based on these factors. And here, we have an individual who's 100% culpable. This isn't, oops, I shot you, my bad. He stabbed her multiple times over and hit her with a frying pan and dented her. She asked for help. She pleaded for him to call the police. And what did he do? He finished her off on the bathroom floor in front of their 22-year-old son. Also, he wasn't an accomplice. He wasn't an individual helping somebody else. He didn't know that this wasn't wrong, because he had a history of domestic violence against this individual, against Morea. He went to jail. Her parents told him, stay away. Stop hurting her. Stop beating her. He had been told multiple times to stay away from this defendant. He knew what he was doing. He had a history. There is no way to argue that he didn't know because of his youth. He's an almost 21-year-old man. Furthermore, he attempted to avoid accountability of these crimes. And he tried to hide it. He hit her body on Friday. The next day, he goes with his friends and buys cocaine. Then he goes to a park and ingests it. He goes back to Chicago, buys more drugs. He goes back to his apartment. The police come, wait, let me hide her body. While in jail, he tells his sister, if you can say anything to throw Morea under the bus, that can save 40 years of my life. That is character assassination. And he wasn't satisfied by just killing her. He had to ruin her reputation as well. Try to. There's no argument that Miller should be applied in here. We have LaPointe. We have these egregious crimes. The trial court considered the mitigating and aggravating factors appropriately. And his 63-year de facto life sentence is not excessive whatsoever, given the PSI, given the seriousness of the offense, which is the most important factor. And furthermore, the trial court did consider his very limited potential for rehabilitation, but not applying an extended term sentence for his first-degree murder charge, which he would have been eligible for 40 more years if it happened. Based on everything else stated in the state's brief, the people of the state of Illinois urged this court to uphold the order suppressing the motion,  which was passed. Thank you, counsel. Justice Inhofe, do you have any questions? I do. Thank you. Counsel, good morning. Good morning. Do you agree with the defendant that Harris did leave open an as-applied challenge for persons like the defendant who were over the age when they committed their crimes? Yes, the state acknowledges that other courts, other cases have applied Miller in regards to as-applied challenges to young adults. Yes, those cases are out there. And I believe B. White distinguishes that. Right. But let me ask you this. Was there or why wasn't there enough information about the defendant in the record for us to review his as-applied challenge? I mean, what more than these medical records, the detailed psychological report would have been introduced at a hearing before the trial court? Well, when you're talking about an as-applied challenge, you're assuming that the scientific research was presented to the trial court to consider. It was never presented. And even if this court could, that's under the assumption that Miller applies. So you have to go through that first hurdle. Does Miller apply? If it doesn't, why are you even considering the scientific evidence? And that's our position. It does not apply. And the most appropriate tribunal to review this is a trial court who conducted the sentence in hearing. With respect to the excessiveness of the sentence, the fact that the defendant received only 60 years while he was eligible for extended term is truly irrelevant, isn't it? When it is that his sentence was greater than one and a half times a de facto life sentence. And why is the fact that he was eligible for extended term and only got the maximum important here? Well, it is relevant because here the defendant is arguing that the trial court never considered anything to mitigate that sentence. And I think that's relevant to that point. But the state isn't relying on that to argue that the sentence was appropriate. The state goes on to review the aggravating and mitigating factors which the trial court considered. And it considered the seriousness of the offense the worst offense. And to say that these facts were gruesome is an understatement. Okay. Going back to the issue you started with, which is the emergency exception to justify the entry. What evidence, I mean, don't the officers need some evidence that there was an emergency in progress to enter when we look at the reasonableness of their decision? I mean, here, while there wasn't a 911 call, there was no yelling, they saw no blood, there were no guns. As counsel pointed out, everything was pretty quiet. This was, I mean, why would this, there has to be some indicia of an emergency, right, for them to go in without a warrant? Yes. Even in a missing persons case? That is correct. And here we have the physical manifestations of the defendant. Clearly, something is wrong when the defendant's eyes are rolling in the back of his head. You know what, it's true. We don't have someone yelling. We don't have, he doesn't have cuts on his face. But he looks like he's about to pass out. He's not coherent. He's not articulate. He holds his stomach. At some point, the officers need to escort him to a different part of the building. He's showing physical manifestations that something is wrong. An individual already in that apartment is showing that he needs also medical attention because he's admitted to doing drugs. That's part of that analysis that there's an emergency going on. These people are high. These people are on drugs. This defendant looks like he's about to pass out. And the child court did comment on that. So I believe that that is, even though there's no cuts, there's definitely signs of physical ailments on the defendant. Okay. Thank you. Those are the questions that I have for counsel. Thank you. Thank you, Justice Zinoff. Justice Shastek, do you have any questions? Yes. Just one question. Even with those circumstances as you laid out in your brief, wouldn't there have been sufficient time to get a search warrant? And if not, why not? I'm sorry, Your Honor. You're kind of muddled, and I can't hear the question clearly. Oh, I'm sorry. Can you hear me now? Yes. Okay. Even with the circumstances as you so clearly laid out as well as laid out in your brief, wouldn't there still be sufficient time to have gotten a search warrant in this case? And if not, why not? Well, remember, that defeats the purpose of the emergency aid exception. The purpose is to aid somebody immediately. That is the purpose. So the fact that you go get a warrant, that kind of defeats the purpose why you're there. And also, when the officer testified that he called about getting a narcotic search warrant, he said it could take two hours. So if the victim was injured and dying, because this defendant did stab her, and if that had been later and she was, like, bleeding to death, like, waiting two hours would definitely have been a bad choice. But yes, it defeats the purpose of the emergency aid exception. You don't have time to go in, because you need to check if this missing person is okay. Okay, thank you. I'm going to see one other question. Thank you. Have you found any case law that sets out a bright line rule for, like, immediately? No, I haven't. And that's why the case law is clear. You look at the totality of the circumstances. All cases are different, and they're all unique. And as applied challenge, you submit that he waived that, never argued it in the courts below. That is correct. And I do set a case for that. I believe it's people v. Thomas. But like I said, courts are all over the place. Some courts have honored forfeiture. Some courts haven't. There's really no, like, consistency when they're honoring forfeiture. But I did put it out there for the court to consider. Okay. All right. Thank you very much. I have no further questions. Thank you, Justice Shefferton. Counsel, I have a couple of questions. In your brief on page 12, you state that an independent investigation was already in progress when the officers decided to enter the apartment. My question is, there wasn't an independent drug investigation. Was there? Because the only information in the record is that Sergeant Wells discussed calling the drug unit to get a warrant. Yes, and this is his statement. We need a search warrant based on a drug investigation. Those are his statements. And it serves a dual purpose when you're questioning the defendant. You know, you're trying to ask the defendant where Maria is. But when you're questioning him and he tells you things about drugs, the main purpose of the questioning is to discover, like, Maria. But that investigation also led to incriminating statements by the defendant. So I guess it would go under that. But it's not necessarily an investigation like in the way you would think of it. I would say that he's getting the ball rolling by initiating the narcotics search warrants. Yeah, but you raise this as inevitable discovery, but it never went any further than this discussion, this conversation. So you're calling essentially a conversation and investigation. Well, here's the thing. It's the inevitable discovery doctrine. They couldn't have, like, completed that investigation. That's why it's inevitable. But when they requested that search warrant, it was for the purpose to further conduct to search for drugs. To further conduct that investigation. Okay. How do you address the holding in People v. Carter that says a theoretically attainable search warrant does not justify a warrantless search of someone's home? Oh, okay. So in that case, it wasn't clear whether the state could have, in fact, obtained a warrant. In that case, the court held that the source, the information about the gun, was the defendant's accomplice. So, the appellate court questioned whether officers had enough information to request a warrant in the first place. And also, the officers had just executed a search warrant. They were looking for drugs. And if I'm – and I believe how I read it, that case, the officers never tried to call to get a search warrant. The state's argument was that they could have. Here, they actually did try to get that search warrant. They called – Wells called a supervisor. So all those facts distinguish the case at hand. So you distinguish it primarily on the fact that here, they could have obtained a search warrant. No, no, no, no, no. In Carter, the state argued that they could have. They never even tried. Here, they did try. No, I know, but I'm saying – I understand, but I'm saying you distinguish Carter from the facts here because here, Wells or the police could have, in fact, obtained a search warrant. They could have gotten a search warrant for the narcotics, but in searching – Correct. That's what I mean. Absolutely, but for Maria, they went in there to go find her and make sure she was safe, pursuant to the emergency aid exception. Okay. While the record doesn't provide us with the exact time that the officers entered the apartment, we can assume it was sometime after Officer Farborough arrived, which was approximately an hour after the police arrived at the defendant's apartment. How can you – and I know this was asked, but how can this constitute an emergency? Again, these individuals are getting information, and I'm not a police officer. I can't say, oh, I gathered this information earlier. I would have thought this is an emergency at that point. I'm not a police officer. I've not been trained to handle emergency situations, but also to that point, there were three different officers. Two officers were talking to the defendant, and the third officer was talking to another person. And also, the defendant lied to the officers about going into work. These officers are obtaining information that this defendant is lying about her. Her vehicle is there. He's lying to them. Okay. Thank you, Counsel. I have no further questions. Justice Inhofe, do you have any additional questions? No, I do not. Justice Shostak, do you have any further questions? None further. Thank you. Thank you. Mr. McCoy, you can proceed with rebuttal. Thank you, Your Honor. On the first point, on our suppression issue, counsel says that officers were trained and that they were not trained to act in a panic. We're not saying that they should have acted as if they were in a panic. What we're arguing is that they needed to act with urgency, and that is what is lacking in terms of the emergency exception. In terms of inevitable discovery, our contention is this wasn't an independent investigation, and we rely on People v. Carter, which rejected this argument, because really allowing inevitable discovery here would sort of encourage police officers to forego getting a warrant and just to rely on inevitable discovery to justify post hoc what they've already done. On the sentencing issue, counsel frames this issue as whether, does Miller apply? And in a sense, that's not the right way to think about this argument, because what indisputably applies is the Illinois Proportionate Penalties Clause. And although the direct holding of Miller involves obviously a younger defendant, the reasoning behind Miller is much broader, and it tells us, informs our proportionate penalties analysis, that this sentence shocks the moral sense of the community. And that's been found by other cases, again, which we've cited in our opening and reply briefs. I would just point out two of them. People v. Franklin, which involved an 18-year-old defendant, it found that mental health issues may lower a defendant's functional age. And similarly, People v. Savage, which actually involved a 22-year-old defendant, found that mental health issues and drug addiction can lower the defendant's functional age. So again, we're not asking this court to do something that no court has ever done before. We're asking it to follow established precedent. And then finally, I would just note that, again, we're not denying that these were brutal, tragic facts in this case. Terrible decisions were made. But what's important and what the underlying reasoning of Miller tells us is that just because some terrible event occurred, that doesn't mean that that is inevitably and perpetually who the defendant will be. Juveniles, young adults are not static. They change. I mean, that is the heart of Miller. And we see that with Michael in this case. We see that in his jail behavior. We see that in the psychological evaluation. And just this is not the type of person that should be sentenced to, in all likelihood, die in prison. And so for those reasons, and those mentioned before, we, again, just ask this court to either reverse the suppression, motion denying the suppression motion, or alternatively grant the sentencing relief that we ask for. Thank you. Thank you, Counsel. Justice Inhofe, do you have any questions? No, I do not. Thank you. Justice Shostak, do you have any questions? No, I have one question. Mr. McCoy, the burden would be on you to prove that the defendant's mental health condition lowers his functional age by perhaps putting on an expert, correct? Well, again, our contention is that in this case, given the hundreds of pages of psychological records, and specifically the psychological evaluation that was done by an expert in this case, that we have met that burden. Fair enough. Thank you. Mr. McCoy, with respect to your argument that the sentence was at least excessive, when you read the defendant's psychological report, it paints a different picture of the defendant. He's intensely angry and lacks the ability to control this anger. He's a high risk to reoffend. He's impulsive, irresponsible, seems to lean towards criminal activity. Let me stop there because I know you read it, but how can this court find a sentence of 60 years as excessive or disproportionate to the crime here? Well, you know, this is where our arguments kind of overlap between our constitutional argument and our excessive sentencing argument. It really, in many ways, goes back to the scientific research that underlies Miller and its perogeny. And the fact is that the defendant is not, as I said, he's not a static individual. There is change. The fact that this is who the defendant is when he's 20 years old doesn't mean that that's who he's going to be when he's 40 years old or 50 years old. And the sentence here just removes any possibility of rehabilitation. When you're giving a sentence that's over 20 years more than a life sentence, that is an abuse of discretion, given what we know about the neurological developments of young adults. Thank you, counsel. I have no further questions. Justice Zinoff or Justice Shostak, do you have any questions? No, I do not. Thank you both. The court thanks both parties for your arguments this morning. The case will be taken under advisement and a disposition will be rendered in due course. Mr. Clerk, you may close the case and terminate the proceedings. Thank you.